**Let W. LEE, Plaintiff–Appellant,**

**v.**

**BANKERS TRUST COMPANY, Defendant–Appellee.**

**Docket No. 98–7504**

United States Court of Appeals, Second Circuit.

Argued Nov. 25, 1998.

Decided Feb. 10, 1999.

Anne C. Vladeck, Vladeck, Waldman, Elias & Engelhard, New York, NY, for Appellant.

Gandolfo DiBlasi, Sullivan & Cromwell, New York, NY, for Appellee.

Leo T. Crowley, Winthrop, Stimson, Putnam & Roberts, New York, NY, for Amicus Curiae The New York Clearing House Association.

Thomas C. Baxter, Jr., Federal Reserve Bank of New York, New York, NY, for Amicus Curiae Board of Governors of the Federal Reserve System.

Before: OAKES, WALKER and McLAUGHLIN, Circuit Judges.

## BACKGROUND

McLAUGHLIN, Circuit Judge:

In 1990, Bankers Trust Company ("Bankers Trust"), hired Let W. Lee as a Vice President for Global Retirement and Security Services. Later it promoted him to Managing Director. In April 1994, Bankers Trust asked Lee to work in its Global Security Services practice, and he agreed. Lee always worked in the New Jersey offices of Bankers Trust.

In Spring 1995, Lee asked two Bankers Trust employees, Harvey Plante and Gerard Callaghan, to look into Bankers Trust's older "custody credit" accounts. These accounts had been languishing unclaimed for long periods, and Lee asked Plante and Callaghan to determine whether Bankers Trust could properly keep some of this money rather than letting it escheat to the state. Plante told Callaghan and Lee that Bankers Trust had more than $3.9 million in the accounts that did not have to be escheated. Lee and Callaghan then told Plante that any non-escheatable funds that were properly documented should be transferred to a reserve account at Bankers Trust.

Plante was placed in charge of the reserve account. Lee maintains that he told Plante: (1) to clear all dealings with Bankers Trust's compliance department; (2) not to transfer any money that was not properly documented; (3) not to transfer any funds that might possibly be escheatable; and (4) to keep a detailed list of funds in the reserve account.

In March 1996, Bankers Trust became troubled by Plante's activities and questioned him about the reserve account. Shortly thereafter, Bankers Trust let Lee know that Plante claimed that Lee had told him to transfer *escheatable* funds into the reserve account. Lee denied this claim.

On March 21, 1996, Lee met with John Foos, John Peters and Elizabeth Hughes, all of whom worked in Bankers Trust's Securi-

ties Services practice. After meeting with this trio for over five hours, Lee signed a statement prepared by Bankers Trust. Bankers Trust then ordered Lee to stay out of his office while it conducted an investigation. Lee claims that by the end of March 21st, everyone at Bankers Trust was discussing his involvement in some kind of wrongdoing.

In early June 1996, Lee claims that Richard Coffina, Head of Human Resources at Bankers Trust, told him that the firm would like him to resign. Lee did resign on June 6, 1996. The press reported that Lee left Bankers Trust amid allegations of wrongdoing. Bankers Trust never made any public statement regarding Lee's activities or the reason for his departure.

Lee claims that after his resignation, Bankers Trust filed a "Suspicious Activity Report" ("SAR") with the United States Attorney's Office for the Southern District of New York. This claim is curious because an SAR is a confidential report that financial firms are required by law to file when they suspect illegal activities by their employees. Disclosure of even the filing of an SAR, let alone disclosure of its substance, is prohibited by law. Thus, it remains a mystery as to how Lee knows that Bankers Trust filed an SAR.

On October 30, 1996, Lee filed suit in the United States District Court for the Southern District of New York (Batts, *J.*), alleging that Bankers Trust defamed him through its *conduct* in investigating the reserve accounts. His complaint focuses on Bankers Trust's search of his office and its alleged filing of an SAR. He also asserted a claim for false imprisonment.

Bankers Trust moved to dismiss the complaint for failure to state a claim. Judge Batts granted the motion, finding that the defendant is immune from a defamation claim based on the alleged filing of an SAR, and that the other actions by Bankers Trust were not "statements" that could support a claim for defamation. She also dismissed the false imprisonment claim as frivolous. Lee now appeals, arguing that: (1) Bankers Trust does not enjoy absolute immunity from liability for statements in the SAR that it purportedly filed; (2) its other actions can support a claim for defamation; and (3) Judge Batts should have applied New York, not New Jersey law in assessing his defamation claims. Lee does not appeal the dismissal of his false imprisonment claim.

## DISCUSSION

### I. *Defamatory Statements in the SAR*

■ In his complaint, Lee alleged that Bankers Trust defamed him in an SAR filed with the United States Attorney for the Southern District of New York. While refusing to confirm or deny the filing of an SAR, Bankers Trust counters that it has immunity for any allegedly defamatory statements made in such a filing. Lee recognizes that Bankers Trust enjoys some immunity for statements in an SAR, but argues that this immunity extends only to statements made in good faith. Lee is incorrect.

■ This Court reviews *de novo* a district court's decision to dismiss a complaint for failure to state a claim, taking all factual allegations as true and construing all reasonable inferences in the plaintiff's favor. *See Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). Dismissal is proper only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The regulations promulgated under the Annunzio–Wylie Act (the "Act"), 31 U.S.C. § 5318(g), require financial institutions like Bankers Trust to file an SAR "no later than thirty (30) days after the initial detection of a known or suspected violation of federal law, a suspected transaction related to money laundering activity, or a violation of the Bank Secrecy Act." 12 C.F.R. § 208.20(d) (1997). Institutions are prohibited from acknowledging filing, or commenting on the contents of, an SAR unless ordered to do so by the appropriate authorities. *See* 12 C.F.R. § 208.20(j) & (g).

SAR filers are protected from civil liability by the "safe harbor" provision of the Act, which provides:

> Liability for disclosures. Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.

31 U.S.C. § 5318(g)(3) (Supp.1998). The safe harbor provision applies, regardless of whether the SAR is filed as required by the Act or in an excess of caution. *See* 12 C.F.R. § 208.20(k) (1998) (to be recodified at 12 C.F.R. 208.62(k) (1999)).

Although the regulation does not say so, Lee argues that there is immunity only where the disclosures in the SAR were made in good faith. We disagree.

It is axiomatic that the plain meaning of a statute controls its interpretation, *see Greenery Rehabilitation Grp., Inc. v. Hammon,* 150 F.3d 226, 231 (2d Cir.1998), and that judicial review must end at the statute's unambiguous terms. *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous. *See Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1073 (2d Cir.1993).

The plain language of the safe harbor provision describes an unqualified privilege, never mentioning good faith or any suggestive analogue thereof. The Act broadly and unambiguously provides for immunity from *any* law (except the federal Constitution) for *any* statement made in an SAR by *anyone* connected to a financial institution. There is not even a hint that the statements must be made in good faith in order to benefit from immunity. Based on the unambiguous language of the Act, Bankers Trust enjoys immunity from liability for its filing of, or any statement made in, an SAR.

Our conclusion based on the language of the Act is bolstered by a common sense appraisal of the safe harbor provision's place within the Act. Financial institutions are required by law to file SARs, but are prohibited from disclosing either that an SAR has been filed or the information contained therein. *See* 12 C.F.R. § 208.20(k) (1998). Thus, even in a suit for damages based on disclosures allegedly made in an SAR, a financial institution cannot reveal what disclosures it made in an SAR, or even whether it filed an SAR at all.

Under plaintiff's theory, he can allege, on information and belief, that a bank filed an SAR containing allegedly defamatory statements that were not made in good faith. If the bank sought summary judgment, it would then have to establish that the statements in the SAR were made in good faith, but it would be prohibited by law both from disclosing the filing or the contents of an SAR. It flies in the face of common sense to assert that Congress sought to impale financial institutions on the horns of such a dilemma.

Finally, although the safe harbor provision is unambiguous, and does not require resort to legislative history, the history of the Act demonstrates that Congress did not intend to limit protection to statements made in good faith. An earlier draft of the safe harbor provision included an explicit good faith requirement for statements made in an SAR. *See* 137 Cong. Rec. S16,642 (1991). However, the requirement was dropped in later versions of the bill, and was not included in the bill that was eventually enacted by Congress. *See* 137 Cong. Rec. S17,910, S17,969 (1991); 31 U.S.C. § 5318(g)(3).

Lee urges us to ignore the plain meaning of the Act, the "common sense" argument, and the legislative history, and to accept the analysis suggested by the Eleventh Circuit in *Lopez v. First Union Nat'l Bank,* 129 F.3d 1186 (11th Cir.1997). In *Lopez,* the court stated that the safe harbor provision protects institutions only if they have "a good faith suspicion that a law or regulation may have been violated." *Lopez,* 129 F.3d at 1192–93. *Lopez* did not explain where the requirement

of a "good faith suspicion" came from, or why it was necessary to its decision.

We decline to import a good faith requirement into the statute. The Act provides immunity for "disclosure of *any possible* violation of law or regulation." 31 U.S.C. § 5318(g)(3) (emphasis added). We conclude that the safe harbor provision does not limit protection to disclosures based on a good faith belief that a violation has occurred.

## II. *Defamation by Conduct*

In addition to the alleged defamatory statements in the SAR, Lee's complaint also alleges that he was defamed by Bankers Trust's conduct in searching his office and allegedly instructing Lee not to come into work for a time. Judge Batts found that: (1) Lee's defamation claims are governed by the law of New Jersey; and (2) under New Jersey law, Bankers Trust's actions were not defamatory. We agree.

### A. *Choice of Law*

Lee argues that his defamation claims are governed by the law of New York, the state where Bankers Trust is headquartered. We conclude that, although New York has some concern in this litigation, it is New Jersey that has the dominant interest in the dispute, and, accordingly, its substantive law governs.

■■■■■ A federal court sitting in diversity applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In tort cases like this, New York applies the law of the state with the most significant interest in the litigation. *See Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001 (1994). In weighing interests, New York distinguishes between "conduct regulating" and "loss allocating" rules. *See Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir.1998). If conduct regulating rules are in conflict, New York law usually applies the law of the place of the tort (*"lex loci delicti"*). *See id.* (citing *Padula*, 84 N.Y.2d at 522, 620 N.Y.S.2d at 311, 644 N.E.2d 1001). However, if loss allocating rules conflict, the choice of law analysis is governed by the so-

called *Neumeier* rules. *See Neumeier v. Kuehner*, 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 70, 286 N.E.2d 454 (1972); *Padula*, 84 N.Y.2d at 522, 620 N.Y.S.2d at 312, 644 N.E.2d 1001.

■■■■ Discouraging defamation is a conduct regulating rule, and, so, the law of New Jersey, the situs of the tort, should control. *See Sheldon*, 135 F.3d at 853. The allegedly defamatory actions (the search of Lee's desk and his expulsion from the workplace) took place at Bankers Trust's offices in New Jersey.

■■■■ Lee is domiciled in New Jersey. Even if we were inclined to ignore the *lex loci delicti*, New Jersey law would still apply. Under New York choice-of-law rules in defamation cases "the state of the plaintiff's domicile will usually have the most significant relationship to the case," and its law will therefore govern. *Reeves v. American Broad. Co.*, 719 F.2d 602, 605 (2d Cir.1983). Although the preference for the plaintiff's domicile is not conclusive, " 'the significant contacts [in a defamation case] are, almost exclusively, the parties' domiciles and the locus of the tort.' " *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)). Under these circumstances, New York choice-of-law rules require us to apply New Jersey substantive law. *See Reeves*, 719 F.2d at 605.

■■■■ Lee argues that the proper choice of law analysis here is a nine-factor test that has been adopted by a number of district courts in this Circuit to decide which state's law governs a defamation claim. *See, e.g., Davis v. Costa–Gavras*, 580 F.Supp. 1082, 1091 (S.D.N.Y.1984). However, as we long ago pointed out, this nine-factor test applies, if at all, only in cases of *multi-state* publication of defamatory material—i.e., publication of a libelous article by a magazine that is distributed in a large number of states. *See Zuck v. Interstate Pub. Corp.*, 317 F.2d 727, 734 n. 12 (2d Cir.1963) (noting that test applies only to multi-state publication). Any "publication" by Bankers Trust occurred only in New Jersey, or, at most, New Jersey and

New York. Thus, even assuming that the New York Court of Appeals would adopt it, use of the nine-factor test for multi-state publication is not appropriate in this case.

### B. *Defamation under New Jersey Law*

▮ Judge Batts held that Lee's complaint failed to state a claim for defamation under New Jersey law because New Jersey does not recognize defamation by conduct. We agree.

▮ To state a claim for defamation under New Jersey law, a plaintiff must allege: (1) a false and defamatory *statement;* (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) damages. *See Feggans v. Billington,* 291 N.J.Super. 382, 677 A.2d 771, 775 (N.J.Super.Ct.App.Div.1996).

▮ Lee argues that Bankers Trust defamed him not by a statement in the usual sense, but by its *conduct* in searching his office and refusing to allow him to come to work for a few days. In New Jersey, "[t]he threshold inquiry in a slander lawsuit is 'whether the language used is reasonably susceptible of a defamatory meaning.' " *Ward v. Zelikovsky,* 136 N.J. 516, 643 A.2d 972, 978 (N.J.1994) (quoting *Kotlikoff v. The Community News,* 89 N.J. 62, 444 A.2d 1086, 1088 (N.J.1982)). Determining whether a statement is susceptible of a defamatory meaning is a question of law for the court. *See id.*

▮ Three factors inform the assessment of potential defamatory meaning: (1) content; (2) verifiability; and (3) context. *See id.* The content factor requires a court to examine the "fair and natural meaning" that ordinary persons of reasonable intelligence would ascribe to the statement. *Romaine v. Kallinger,* 109 N.J. 282, 537 A.2d 284, 288 (N.J.1988). The verifiability factor focuses on whether the statement was one of objective fact or subjective opinion—the more subjective the statement, the less likely it is to have a defamatory meaning. *See Ward,* 643 A.2d at 979–80; *see also Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 17–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

Finally, courts must consider the impression created by the statement, "as well as the general tenor of the expression." *Ward,* 643 A.2d at 980. When assessed in light of these three factors, we conclude that any statements published by Bankers Trust are not reasonably susceptible of a defamatory meaning.

#### 1. *Content*

Lee argues that the search of his desk and the order to stay away from work were the functional equivalent of statements that he was a thief. We disagree.

Most authorities recognize that actions may indeed be statements, and can support a defamation claim. *See* Restatement (Second) of Torts § 566. For certain types of conduct, this rule makes eminently good sense. For example, an affirmative nod in response to a question about a person's reputation might be highly defamatory. *Other sorts of actions,* however, such as taking a breath or turning one's head in response to a noise, usually have little factual content. Thus, assessing the possible defamatory content of an action is an ephemeral task. However, as the issue of defamatory content is one of law for the court to resolve, this difficult question is properly resolved on a motion to dismiss. *See Ward,* 643 A.2d at 978.

In this case, Bankers Trust looked through Lee's desk and advised him to stay away from work. To a reasonable observer, its actions connoted, at worst, its *suspicion* of Lee and its *opinion* that he might be involved in wrongdoing. The search and the request that he stay away from work for a few days would not be taken as objective statements of fact by an observer, but rather would be seen as intimations of a suspicion that Lee *might* be involved in problems with the escheatable funds. Thus, we find that the content of Bankers Trust's actions weighs against a finding of defamatory meaning.

#### 2. *Verifiability*

▮ As statements of opinion, Bankers Trust's actions are not verifiable in any meaningful sense. That the bank suspected

Lee of wrongdoing is not the sort of statement of objective fact that can support a claim of defamation. Opinion cannot defame unless a reasonable factfinder would conclude that the statement implies reasonably specific assertions of fact. *See Milkovich,* 497 U.S. at 18–20, 110 S.Ct. 2695. To the extent that Bankers Trust's actions implied anything, it would have been a vague assertion of suspicion of some undisclosed wrongdoing by Lee. Its actions therefore are not sufficiently verifiable to have a defamatory meaning.

### 3. Context

The context in which Bankers Trust acted toward Lee cuts both ways. On the one hand, Lee was being investigated in a climate where many Bankers Trust employees had some knowledge that wrongdoing was suspected. Thus, Bankers Trust's actions could arguably be interpreted to harm Lee's reputation.

On the other hand, Bankers Trust made no public statements about Lee and the suspected wrongdoing. Because the bank never made an accusatory statement about Lee, the context of its actions support the conclusion that they connoted, at most, its opinion that Lee might be involved in wrongdoing. As explained above, a contingent, subjective statement of this type lacks defamatory content under New Jersey law. *See Ward,* 643 A.2d at 979–80.

### 4. Combination of Factors

Weighing all three factors separately, and then together, we conclude that Bankers Trust's actions, which at most implied that it suspected Lee of some vague wrongdoing, do not constitute a defamatory statement under New Jersey law. Our conclusion is bolstered by the only New Jersey case remotely on point. In *Schwartz v. Leasametric, Inc.,* 224 N.J.Super. 21, 539 A.2d 744 (N.J.Super.Ct.App.Div.1988), the court rejected a claim of defamation where an employer performed a non-consensual search of an employee's desk, while aiming abusive language at the employee. The court took pains to explain that the employer's "requests for plaintiff's keys and files and his offer of a recommendation letter were not defamatory.

Although plaintiff objected to Brown's searching of his car and desk for the missing report, these actions were not defamatory statements." *Id.* at 747.

Under the circumstances of this case, we find, as a matter of law, that Bankers Trust's actions towards Lee are not susceptible of a defamatory meaning.

### CONCLUSION

In sum,

(1) any statements made by Bankers Trust in an SAR cannot serve as the basis of a defamation claim by Lee because of the immunity provided by the safe harbor provision of the Act.

(2) Bankers Trust's conduct towards Lee around the time of his resignation is not, as a matter of New Jersey law, susceptible of a defamatory meaning.

(3) As Lee's complaint fails to allege any statement or conduct that can form the basis of a defamation claim, Judge Batts correctly dismissed the complaint for failure to state a claim.

Accordingly, the judgment of the district court is hereby AFFIRMED.