**Ronnie WEIL, et al, Plaintiffs,**

v.

**The LONG ISLAND SAVINGS BANK, Defendant.**

**No. CV 94–1292(TCP)(WDW).**

United States District Court,
E.D. New York.

Aug. 22, 2001.

384

John B. Amrod, Amrod & Ricci, Garden City, NY, Louis Aloysius Jr. Craco, Jr., Davis Weber & Edwards, P.C., New York City, John B. Amrod, Amrod & Ricci, LLP, Garden City, NY, for Plaintiffs.

Russell E. Brooks, Milbank, Tweed, Hadley, McCloy, New York City, Paul F. Corcoran, Davis & Gilbert, New York City, Thomas P. Puccio, New York City, Joel Cohen, Stroock & Stroock & Lavan LLP, New York City, for Defendant.

## ORDER

WALL, United States Magistrate Judge.

Before the court is a letter motion by the plaintiffs dated July 3, 2001 (Edwards Letter), seeking an order to compel the production of "all documents relating or referring to a 'criminal referral' filed by the Bank concerning the relationship of James J. Conway ... with the defendant Law Firm." The motion is opposed by the Bank and Director defendants by letter dated July 12, 2001 (Brooks Letter), and is also opposed by the Office of Thrift Supervision ("OTS") by letter dated July 18, 2001 (Roberts Letter). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

This is a class action lawsuit alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; the Truth–in–Lending Act ("TILA"), 15 U.S.C. § 1638; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607; common law fraud, violations of section 349 of New York General Business Law, and negligent supervision. The plaintiffs are all individuals who obtained residential mortgage loans from the Bank ("LISB") during the period January 1, 1983 to December 31, 1992, and were required to pay LISB's legal fees in connection with their loan transactions. Those legal fees were paid to the law firms of Power, Meehan & Petrelli, P.C. and Power, Meehan & Power, P.C., which were successors in interest to Conway & Ryan, P.C. (collectively, the "Law Firm" or "Law Firm defendants"), the former law firm of LISB's chief executive officer, defendant James J. Conway, Jr. ("Conway"). The plaintiffs maintain that the legal fees were inflated above those which would normally be charged for the processing and closing of residential mortgage loans, and that the excess was used to pay $11 million in kickbacks to Conway and his family for Conway's promise to use the Law Firm as LISB's attorneys in connection with all of LISB's mortgage loans.

Conway's conduct was the subject of investigations by both the United States Attorney's Office for the Eastern District of New York and the OTS. Conway pled guilty to criminal charges in connection with an indictment in the Eastern District of New York and, as part of a settlement reached with the OTS, agreed to withdraw from the banking business for life. In March 1994, after the press had reported the results of the OTS investigation, class representative Ronnie Weil commenced this litigation.

In 1992, LISB commenced an action before the United States Court of Claims against the United States (Index No. 92–517C) alleging breach of contract and seeking damages from the government arising out of the phase-out and elimination of regulatory capital treatment for supervisory goodwill ("the goodwill case"). The United States has recently asserted affirmative defenses and counterclaims in that action, related to the conduct of Conway that is at issue in this action. In May 2001, the Bank filed a brief in the goodwill case "stating that 'it had informed OTS upon learning the facts [concerning Conway's relationship with the Law Firm] and filed a criminal referral with OTS and other law enforcement agencies'." See Edwards Letter at 1, & Ex. C. The plaintiffs now seek to compel the production of "all documents relating or referring to" the criminal referral form filed with the OTS. Id.

The court assumes that the "criminal referral" mentioned by the plaintiffs is a document also known as a Suspicious Activity Report ("SAR"), inasmuch as the parties' and the OTS's arguments are all couched in the law regarding disclosure of SARs. The plaintiffs claim that the Bank's acknowledgment that an SAR was filed "is flatly inconsistent with the position defendants have taken in this litigation," that "there was nothing wrong with Conway's relationship with the Law Firm." Edwards Letter at 1. Plaintiffs assert that the filing of the SAR specifically contradicts the Bank's 30(b)(6) testimony by John Conefry. Mr. Conefry, the former vice-chairman of the Bank, testified that counsel for a Special Audit Committee of the Board "found no evidence of any wrongdoing on the part of the Bank or any of its officers

or directors or employees." Edwards Letter at 1 & Ex. A at 42–43.

The Bank opposes the production of the documents on various legal grounds, discussed *infra*, and also argues, in regard to Mr. Conefry's testimony, that the "Bank and Director Defendants have stipulated that they will not rely upon testimony about the internal investigation in defending this matter." Brooks Letter at 3.

## DISCUSSION

*Applicable Law:*

Both the defendants and the OTS object to the production of any SAR concerning James Conway that LISB may have submitted to federal law enforcement agencies on the ground that SARs are exempt from disclosure under 31 U.S.C. § 5318(g), the Annunzio–Wylie Act, and 12 C.F.R. § 563.180(d), a regulation enacted pursuant to that statute. Congress passed the Annunzio–Wylie Anti–Money Laundering Act ("the Act") in 1992. The provisions of the Act go beyond money laundering, however, and *inter alia*, give the Secretary of the Treasury power to require banks and other financial institutions to report various suspicious transactions to the appropriate authorities. *See Nevin v. Citibank,* 107 F.Supp.2d 333, 340 (S.D.N.Y.2000). The regulations promulgated require a financial institution to file an SAR "no later than thirty (30) days after the initial detection of a known or suspected violation of federal law, a suspected transaction related to money laundering activity, or a violation of the Bank Secrecy Act." *Lee v. Bankers Trust Co.,* 166 F.3d 540, 543 (2d Cir.1999) (citing 12 C.F.R. § 208.20(d) (1997)).

The court in *Lee* also noted that, pursuant to the regulations, "Institutions are prohibited from acknowledging filing, or commenting on the contents of, an SAR unless ordered to do so by the appropriate authorities." *Id.* (citing 12 C.F.R. § 208.20(j) & (g)). Moreover, the court found, "Financial institutions are required by law to file SARs, but are prohibited from disclosing whether an SAR has been filed or the information contained therein." *Id.* (citing 12 C.F.R. § 208.20(k)(1998)).

The confidentiality regulation referred to in *Lee* as 12 C.F.R. § 208.20(k) is now numbered 12 C.F.R. § 563.180(d)(12)(2001), and states:

**(12) Confidentiality of SARs.** SARs are confidential. Any institution or person subpoenaed or otherwise requested to disclose a SAR or the information contained in a SAR shall decline to produce the SAR or to provide any information that would disclose that a SAR has been prepared or filed, citing this paragraph (d), applicable law (e.g., 31 U.S.C. 5318(g)), or both, and shall notify the OTS.

31 U.S.C. 5318(g), the enabling legislation for the regulations, provides:

**Reporting of suspicious transactions.—**

**(1) In general**—The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.

**(2) Notification prohibited**—Any financial institution, and any director, officer, employee, or agent of any financial institution, who voluntarily reports a suspicious transaction, or that reports a suspicious transaction pursuant to this section or any other authority, may not notify any person involved in the transaction that the transaction has been reported.

(Bold in original).

*Confidentiality Requirements of 12 C.F.R. § 563.180(d)(12):*

The defendants argue that the terms of the regulation and the enabling statute, along with their analysis in *Lee,* require denial of the motion to compel. Although *Lee* focused on the safe harbor provision of the statute (see 31 U.S.C. 5318(g)(3)), and not on the confidentiality section (see 31 U.S.C. 5318(g)(2)), in assessing the "safe harbor provision's place within the Act," the court clearly acknowledged the regulation's broad prohibition against a financial institution's disclosure of the fact that an SAR was filed or the information contained therein. *Lee,* 166 F.3d at 544; *see also Nevin,* 107 F.Supp.2d at 342 (interpreting holding in *Lee* to mean that "not only the plain language of the statute but also sound public policy dictate[ ] that anything contained in an SAR enjoy[s] an unqualified privilege.")

The plaintiffs argue that, despite what the regulation may say, administrative agencies do not have "the power to promulgate regulations in direct contravention of the Federal Rules of Civil Procedure." Edwards Letter at 2 (quoting *In re Bankers Trust Co.,* 61 F.3d 465, 470 (6th Cir. 1995); *Golden Pacific Bancorp. v. FDIC,* 1999 WL 1332312 at *3 (D.N.J.1999)). In other words, under the plaintiffs' argument, Rule 34 trumps 12 C.F.R. § 563.180(d)(12). This issue was not addressed in *Lee.*

At issue in *Bankers Trust,* the Sixth Circuit case relied on by the plaintiffs, was a discovery demand that the bank "produce all documents submitted to or received from the Federal Reserve, including 'any and all documents relating to any and all regulatory reports of examination and inspection which relate to or refer to' " the facts underlying the lawsuit. 61 F.3d at 467. The relevant regulation in *Bankers Trust* was not 12 C.F.R. § 563.180(d)(12), but 12 C.F.R. § 261, which embodies the "bank examination privilege," and provides

that the documents in question remain the property of the Federal Reserve Board, that a party seeking their production must request them directly from the Federal Reserve, and that any organization or institution in possession of such documents, if called upon to produce them, shall decline to do so pursuant to the regulations. *See* 61 F.3d at 467, 469. In *Bankers Trust,* the Sixth Circuit observed that it was confronted with a situation "in which the Board's regulations conflict with the Federal Rules of Civil Procedure with respect to a district court's authority, under the Federal Rules, to control discovery," specifically Rule 34, the same general issue now before this court. *Id.* at 469.

The Sixth Circuit recognized that "federal regulations should be adhered to and given full force and effect of law whenever possible." That is, "[a]s long as the federal agency's regulation is based upon a permissible construction of the enabling statute, the regulation should be enforced." *Id.* at 470 (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). It noted, however, that broad, general grants of authority, such as those relied on by the Federal Reserve in regard to 12 C.F.R. § 261, simply do not confer "the power to promulgate regulations in direct contravention of the Federal Rules of Civil Procedure." *Id.* The court found that the statutory authorities before the court were merely "housekeeping" statutes granting the Federal Reserve general authority to issue necessary regulations, including regulations regarding "the use and preservation of its records, paper and property." *Id.* (quoting 5 U.S.C. § 301). This, the court found, was not enough. "To allow a federal regulation issued by an agency to effectively override the application of the Federal Rules of Civil Procedure and, in essence, divest a court of jurisdiction over discovery, the enabling

statute must be more specific than a general grant of authority." 61 F.3d at 470.

Applying the reasoning of *Banker's Trust* to this case, the issue thus becomes whether 31 U.S.C. § 5318(g), the enabling legislation for the confidentiality regulation, is specific enough to justify its intrusion into the federal rules governing discovery. As noted *supra*, U.S.C. § 5318(g)(2) specifically prohibits any financial institution that reports a suspicious transaction from notifying any person involved in the transaction that the transaction has been reported. There is, however, no mention of whether the institution can reveal the SAR information to persons other than those involved in the reported transaction, and an argument can be made that the statute is thus insufficiently specific in that regard. A similar argument was made, and rejected, in *In re Mezvinsky*, 2000 Bankr.LEXIS 1067 (Bankr. E.D.Pa. Sept. 7, 2000). In that case, a party made a motion to compel the production of certain SARs and related documents. The bank objected, on the ground that their production was barred by 12 C.F.R. § 21.11(k), now numbered 12 C.F.R. § 563.180(d)(12), the same regulation at issue on this motion. The movant in *Mezvinsky* argued that ·"31 U.S.C. § 5318(g)(2) provides only that banks which file SARs 'may not notify any person involved in the transaction that the transaction has been reported,'" and that "under the language of the statute, as opposed to the regulation, [the bank] is not prohibited from producing any relevant SARs to [the movant] because he was not a 'person involved in the transaction.'" 2000 Bankr.LEXIS 1067 at *5.

The court rejected his reasoning, finding that the "natural consequences of [the movant's] argument if accepted would be to hold [the confidentiality regulation] invalid based on the notion that the regula-

tion is beyond the scope of or inconsistent with 31 U.S.C. § 5318(g)(2)." *Id.* at *6, n. 4 (citing *Steiben v. Immigration and Naturalization Service*, 932 F.2d 1225 (8th Cir.1991)); *Associated Milk Producers, Inc. v. United States*, 22 Cl.Ct. 682 (1991); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (quoting *Dixon v. United States*, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965) to effect that "The rulemaking power granted to an administrative agency charged with administration of a federal statute is not the power to make law [, but] the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.") The *Mezvinsky* court rejected that argument, and ruled that, based on the record before it, the confidentiality regulation now set forth as 12 C.F.R. § 563.180(d)(12) did not exceed, nor was it inconsistent with, 31 U.S.C. § 5318(g)(2).

The basis for the court's ruling was its conclusion that "since the production of SARs by a bank in response to a subpoena would invariably increase the likelihood that the 'person involved in the transaction' would discover or be notified that the SARs had been filed, . . . the regulation is consistent with and in harmony with the statute." 2000 Bankr.LEXIS 1067 at *5–6, n. 4 (citing *United States v. Larionoff*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) ("holding that in order for regulations to be valid, they must be consistent with the statute under which they are promulgated.")) The Bankruptcy Court's reasoning, while not focused on the issue of whether the enabling statute at issue here is too broad to support the confidentiality regulation, supports a finding that it is specific enough.

This conclusion is also supported by the legislative history of the regulation, which, while not conclusive, gives insight to the

intent of the drafters. In the section-by-section discussion regarding the proposed amendments to 12 C.F.R. § 563.180(d)(12), the legislative history notes that the "OTS was encouraged to adopt regulations that would make SARs undiscoverable in civil litigation, in order to avoid situations in which a savings association or service corporation could be ordered by a court to produce a SAR in civil litigation and could be confronted with the prospect of having to choose between being found in contempt or violating the OTS's rules." In the opinion of the OTS, 31 U.S.C. § 5318(g) precludes the disclosure of SARs in discovery. However, the final rule requires an institution that "receives a subpoena or other request for a SAR to notify the OTS so that the OTS can take appropriate action." See Operations—Suspicious Activity Reports and Other Reports and Statements, 61 Fed.Reg. 6100 at 6104 (Feb. 16, 1996) (to be codified at 12 C.F.R. pt. 563), Ex. B to Brooks Letter. Thus, as a matter of legislative history, OTS interprets the regulation to bar disclosure of an SAR, even in response to an otherwise valid Rule 34 demand, a position adhered to by the OTS in its letter in opposition to the motion.

The privilege is, however, limited to the SAR and the information contained therein; it does not apply to the supporting documentation. 12 C.F.R. § 563.180(d)(12) is silent as to the confidentiality of supporting documentation, but the legislative history expressly states that "OTS takes the position that only the SAR and the information on the SAR are confidential under 31 U.S.C. 5318(g)," not the supporting documentation[1]. 61 Fed.Reg. 6100 at 6104; *see Lee*, 166 F.3d at 544 ("Legislative history ... may be relied upon only if the terms of the statute are ambiguous.")

(citing *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1073 (2d Cir.1993)). The court notes that in some cases, the supporting documentation could disclose the existence of an SAR and reveal the content of the SAR, thus thwarting the intent of the regulation. In most cases, however, the disclosure of supporting documentation would not reveal the filing of an SAR, and such documentation cannot be shielded from otherwise appropriate discovery simply because it has some connection to an SAR. This is especially true in a situation such as this one, where everyone apparently already knows that an SAR was filed.

■ Based on the language of the regulation, the relevant caselaw, and the legislative history, this court holds that 12 C.F.R. § 563.180(d)(12) prohibits disclosure of SARs or their content, even in the context of discovery in a civil lawsuit, and that the enabling legislation is specific enough to support that purpose. Supporting documentation, on the other hand, is discoverable. A finding that the regulation establishes a privilege does not, however, end the analysis in this case. The plaintiffs argue that even if some privilege attaches to the SAR, such privilege is qualified and has been waived. For the reasons set forth *infra*, the court does not agree. *Qualification/Waiver of the 12 C.F.R. § 563.180(d)(12) Privilege:*

■ The court finds that, pursuant to the plain language of the regulation, the confidentiality privilege set forth in 12 C.F.R. § 563.180(d)(12) is not qualified. Further, the privilege is not subject to waiver by the financial institution. The plaintiffs argue that the OTS letter of July 19, 2000 waived any privileges that the agency might have had, but that letter

---

1. The legislative history states, on the other had, that the safe harbor provision set forth in § 563.180(d)(13) applies to both SARs and any supporting documentation. 61 Fed.Reg. 6100 at 6104.

specifically waives the qualified privilege set forth in 12 C.F.R. § 512.3, not the privilege at issue here.

The plaintiffs also argue that District Judge Platt's order dated June 14, 1995 held that the Bank has no privilege with respect to factual material submitted to the OTS. See Edwards Letter at 3 and Ex. G. The defendants do not respond to this argument. Like the OTS letter, that order did not concern the regulation in question on the instant motion. Instead, it stated that the factual material that had been sought by a subpoena served on the OTS arose from "OTS proceedings that are confidential by regulation." The court was apparently considering a different regulation, perhaps the same one that OTS referenced in its letter, which provides that OTS documents will remain confidential "unless otherwise ordered or directed by OTS." See 12 C.F.R. § 512.3. OTS had indicated that it had an "informal policy whereby purely factual information will be released pursuant to a subpoena covered by a court-issued protective order." Thus, Judge Platt directed the OTS to turn over the documents and ruled that the private litigants could not invoke a privilege that the government had waived. The language in the regulation at issue in Judge Platt's order, which specifically allowed the documents to remain confidential "unless otherwise ordered or directed by" the OTS, is different from the language of 12 C.F.R. § 563.180(d)(12), which contains no comparable language. Judge Platt's ruling cannot be extended from one context to the other, and does not provide a basis for the granting of plaintiffs' motion in regard to the SAR.

*Conclusion:*

The court recognizes that a policy of strict confidentiality is intended to support the ostensible goal of the Annunzio–Wylie Anti–Money Laundering Act, that is, to encourage financial institutions to report suspicious activity without fear of reprisal, and/or to protect the people who are the subject of the SARs. It also recognizes that the facts of this case make the application of the confidentiality requirement artificial, to say the least. As noted earlier, it is apparent here that everyone involved knows that an SAR was filed, and, given Mr. Conway's criminal prosecution and guilty plea, his reputation is not of serious concern. Nonetheless, the SAR may contain information about other individuals that has not been made public, and, in any event, the plain language of the regulation requires this court to deny the production of the SAR itself. If, however, the Bank defendants are in possession of any "supporting documentation" that has not yet been disclosed, they shall produce such documents within two weeks of the date of this order.

**SO ORDERED.**