**Miguel and Susan VENTURA,**
**Appellants**

v.

**CENTRAL BANK, Appellee**

**NO. 2015–CA–001407–MR**

Court of Appeals of Kentucky.

FEBRUARY 3, 2017; 10:00 A.M.

BRIEF FOR APPELLANT: Mark A. Wohlander, Lexington, Kentucky

BRIEF FOR APPELLEE: Mark Anthony Flores, Barry D. Hunter, Lexington, Kentucky, Patrick E. O'Neill, Jackson, Kentucky

BEFORE: DIXON, NICKELL, AND VANMETER,[1] JUDGES.

## OPINION

DIXON, JUDGE:

Appellants, Miguel and Susan Ventura, appeal from an order of the Powell Circuit Court granting summary judgment in favor of Appellee, Central Bank, and dismissing the Venturas' claims for false light invasion of privacy, breach of fiduciary duty and malicious prosecution. Finding no error, we affirm.

The Venturas own and operate Miguel's Pizza and Rock Climbing Shop in Slade, Kentucky. In 2010, the Internal Revenue Service initiated an investigation into the Venturas' banking activities based upon information reported by Central Bank. The account activity consisted of repeated cash deposits of amounts slightly under the $10,000 threshold that would have triggered federal CTR (cash transaction reporting) requirements. IRS investigators, including Task Force Officer Coy Cox, communicated about the Venturas' banking records with Central Bank employee Angela Campbell on numerous occasions. On November 2, 2010, Campbell emailed Officer Cox to notify him that Central Bank had decided to terminate its business

with the Venturas and close their account. Officer Cox requested that Campbell delay the closure, as he was planning on obtaining a seizure warrant. Campbell agreed, and informed Officer Cox that three additional apparently structured deposits had been made since the previous report and that the balance in the account was at a peak—all information that appeared on the Venturas' account statements that Central Bank had been providing to Officer Cox pursuant to its federal disclosure obligations.

For reasons not disclosed in the record, Officer Cox did not immediately obtain the seizure warrant as he informed Campbell he planned to do. Subsequently, on April 11, 2011, the Venturas withdrew $137,008.00 from their account. They allege that on that day, an unknown bank employee contacted Officer Cox to alert him of such activity, which resulted in the issuance of a seizure warrant for the monies in the Venturas' account. Shortly thereafter, Central Bank informed the Venturas that it was closing their account.

The multi-year investigation culminated in January 2013, with a 109–count federal indictment charging the Venturas with structuring currency transactions in violation of the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5324(a)(3). Following a trial in August 2013, a jury acquitted them on all charges.

On July 15, 2014, the Venturas filed an action in the Powell Circuit Court against Central Bank asserting claims for false light invasion of privacy, breach of fiduciary duty and malicious prosecution, and seeking compensatory and punitive damages. The case was initially removed to

---

1.  Judge Laurance B. VanMeter concurred in this opinion prior to being elected to the Supreme Court of Kentucky. Release of this opinion was delayed by administrative handling.

federal court, however the federal district court found that it did not have subject matter jurisdiction and remanded the matter to the trial court for further proceedings.[2] Central Bank thereafter filed a motion for summary judgment on the grounds that the BSA provides banks with absolute immunity for the disclosure of any possible violation of the law or regulation, made either voluntarily or pursuant to the Act to a governmental agency. By order entered August 4, 2015, the trial court granted summary judgment and dismissed the Venturas' action. This appeal ensued.

Our standard of review on appeal of a summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. The trial court must view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). CR 56 does not require that the case be void of issues, but that it be void of "material issues of fact." *Martin v. Utica Mutual Insurance Co.*, 697 S.W.2d 951 (Ky. App. 1985). In order to defeat a motion for summary judgment, a non-moving party must present at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial. *Hibbitts v. Cumberland Valley National Bank & Trust Co.*, 977 S.W.2d 252 (Ky. App. 1998). Summary judgment is proper only "where the movant shows that the adverse party could not prevail under any circumstances." *Steelvest*, 807 S.W.2d at 480.

On appeal, the Venturas argue that the trial court erred in finding that the BSA provides Central Bank absolute immunity. While the Venturas acknowledge that the BSA does provide immunity to banks for the reporting of suspicious activity, they claim that the November 2010 email exchange between Officer Cox and Campbell fell outside the purview of the BSA because Campbell's disclosures breached the confidentiality of the Venturas' account, and were an attempt to improperly provide Officer Cox with private bank account information so as to intentionally harm them and maximize the seizure of funds that they had in their account.

In 1992, Congress passed the Annunzio–Wylie Anti–Money Laundering Act, 31 U.S.C. § 5318, et seq., popularly known as the Bank Secrecy Act ("BSA"). The Act gave the Secretary of the Treasury the power to require financial institutions to report suspicious transactions to the appropriate government authorities, and contained provisions regarding mandatory and voluntary disclosure of suspicious activity. 31 U.S.C. § 5318(g). The purpose of the Act was to " 'uncover and punish money laundering, particularly in connection with drug trafficking ...' through both voluntary and mandatory reporting." *Stoutt v. Banco Popular de Puerto Rico*, 158 F.Supp.2d 167, 173 (D.P.R. 2001) (*quoting Nevin v. Citibank*, 107 F.Supp.2d 333, 341 (S.D.N.Y. 2000)). The regulations that were promulgated under the BSA specifically require Suspicious Activity Reports

---

**2.** *Ventura v. Central Bank*, 5:14–338–KKC, 2015 WL 65139 (E.D. Ky., Jan. 5, 2015).

("SARs") to be filed whenever a financial institution detects "any known or suspected Federal criminal violation, or pattern of criminal violations, committed or attempted against the bank or involving a transaction or transactions conducted through the bank ... where the bank believes that it was either an actual or potential victim of a criminal violation, or series of criminal violations, or that the bank was used to facilitate a criminal transaction," and (1) a bank insider was involved; (2) over $5,000 was involved, and the bank can identify a suspect; (3) over $25,000 was involved, but the bank cannot identify a suspect; or (4) over $5,000, as well as potential money laundering or violations of the Bank Secrecy Act, were involved. 12 C.F.R. § 21.11(c); *see also* 12 C.F.R. § 208.62(c); 12 C.F.R. § 353.3(a); 31 C.F.R. § 1020.320(a). A financial institution must file a SAR within thirty days after it first detects certain facts that lead it to suspect a possible violation and, in certain situations, must immediately notify the appropriate law enforcement agencies in addition to filing a SAR. 12 C.F.R. § 21.11(d); *see also* 12 C.F.R. § 208.62(d); 12 C.F.R. § 353.3(b); 31 C.F.R. § 1020.320(b).

■ Recognizing that reporting known or suspected violations of law by its customers could expose banks to civil litigation, and in order to further encourage reporting, the BSA provides financial institutions and their officers, employees, and agents immunity under its safe harbor provision from lawsuits based on the financial institutions report or disclosure of suspicious activity. 31 U.S.C. § 5318(g)(3)(A). The safe harbor provision provides:

Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure.

31 U.S.C. § 5318(g)(3)(A). *See also* 12 C.F.R. § 21.11(1); 12 C.F.R. § 208.62(k); 12 C.F.R. § 353.3(h); 31 C.F.R. § 1020.320(f). The immunity afforded banks under the BSA is absolute, and applies "whether the financial institution makes a required or volunteered report, ... whether the report is made to federal, state, or local authorities, ... whether the reported activity eventually turns out to be legal or illegal, ... and whether the report is made with or without a good faith investigation." *Gregory v. Bank One, Indiana, N.A.*, 200 F.Supp.2d 1000, 1002–03 (S.D. Ind. 2002) (citations omitted). As noted by the Federal District Court in *Joseph v. Bancorpsouth Bank*, 414 F.Supp.2d 609, 612 (S.D. Miss. 2005),

[T]his mandate from Congress balances an expectation of privacy with allowing financial institutions to serve as reporting arms to assist law enforcement. While such actions by banks might otherwise invade privacy, Congress has determined that privacy is overcome by the valid reasons for the subject law. Therefore, banks are required to comply with 5318(g)(3). And, in return, banks receive immunity. (Footnote omitted)

As required by the BSA, Central Bank is required to file a SAR within thirty days after it first detects facts that lead it to

suspect a violation. As is applicable to this case, § 5324 of the BSA makes it unlawful for a person to attempt to structure cash deposits with banking institutions in an effort to avoid the bank's filing of a currency transaction report ("CTR"). CTRs are required whenever more than $10,000 cash is deposited. Banks are directed by the Financial Crimes Enforcement Network ("FinCEN"), the federal agency that implements, administers and enforces compliance with the BSA, to report to law enforcement officials any potential indicators of structuring such as frequent cash deposits in an amount just less than the reporting threshold; multiple same day deposits totaling over $10,000, but each under the reporting threshold; cash deposits wrapped in currency straps or rubber bands that do not balance when counted; and the altering of deposits when the depositor is made aware that the CTR requirement has been triggered.

The record herein indicates that the Venturas engaged in a course of conduct that suggested a possible violation of the BSA. Specifically, the Venturas frequently made cash deposits falling just under the $10,000.01 reporting requirement; multiple same-day cash deposits totaling more than $10,000; and deposits wrapped in currency straps that did not balance when counted by the teller. In addition, the Venturas on certain occasions would reduce their deposits below the CTR threshold when they were informed that the deposit exceeded $10,000. As a result of these activities, Central Bank filed the required SARs which led to the ensuing federal investigation.

There is no dispute that Central Bank was legally mandated to file the SARS once it suspected illegal activity with the Venturas' account. However, it was also required to also file any follow-up reports and to respond to any follow-up requests

for supporting documentation by law enforcement or government agencies. 31 C.F.R. § 1020.320(d). The plain language of the BSA provides immunity not only to the filing of SARs, but also to any and all disclosures related to suspicious transactions or activities.

Despite the language of the safe harbor provision, the Venturas argue that the November 2, 2010 email exchange between Officer Cox and Campbell does not fall within the type of disclosures and communications protected by the BSA. In fact, they characterize Campbell's email as essentially a malicious attempt to disclose confidential information to harm them. However, it is clear from the exchange that Campbell contacted Officer Cox to inform him that Central Bank was going to close the Venturas' account—a disclosure that the bank was required to make since that account was under government investigation for suspicious activities. Campbell then responded to Officer Cox's email requesting that they keep the account open because he was preparing to seek a seizure warrant, by telling him that three more structured deposits had been made since the Bank's last report and that the account balance was at a peak—all information that appeared in the account statement.

We are of the opinion that the November 2010 communications were made in the context of an ongoing investigation and pursuant to Central Bank's obligation under the BSA. Contrary to the Ventura's arguments, it matters not that Campbell's disclosure of information to Officer Cox was not pursuant to a court order or subpoena. The BSA immunizes banks for "voluntary disclosures," or disclosures "pursuant to [the Act] or for disclosures pursuant to any other authority." As such, whether Central Bank made its disclosures on its own or at the request of a federal agency is immaterial for purposes of immunity

under the BSA. Further, while it is true that the Ventura's account was ultimately not closed until April 2011, we find nothing in the record to support the Venturas' claim that Campbell assisted Officer Cox in intentionally keeping the account open for an additional five months so that a larger sum of money could be seized. In fact, there is no indication as to why Officer Cox did not obtain the seizure warrant in November as he stated that he was going to do.

Although the Venturas maintain that Campbell acted in bad faith with an intent to harm them, it is significant that the BSA's safe harbor provision contains no good faith requirement. 31 U.S.C. § 5318(g)(3). In *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2nd Cir. 1999), the Second Circuit Court of Appeals observed that the language of the BSA was unambiguous and therefore required no analysis of the legislative history. However, the court nevertheless found the legislative history to be indicative of legislative intent in that a prior version of the safe harbor provision included an "explicit good faith requirement for statements made in an SAR." *Id.* (citation omitted). The good faith requirement was removed in subsequent versions and was not included in the final version of the Act. *Id.*; 31 U.S.C. § 5318(g)(3)(A)). Thus, the Court concluded that removal of the good faith provision indicated the probable intent of Congress that good faith not be a prerequisite for immunity. Subsequently, in *Stoutt v. Banco Popular De Puerto Rico*, 320 F.3d 26 (1st Cir. 2003), the First Circuit Court of Appeals agreed with *Lee* but observed that with no good faith requirement, some plaintiffs may be left without any civil redress against a financial institution— even for "malicious or wholly unfounded accusations." *Id.* at 31. Nevertheless, the

Court concluded that any such concerns were offset by the countervailing concerns for encouraging bank disclosures.

■ We find *Lee* and *Stoutt* to be instructive persuasive authorities for a finding that the BSA does not impose a good faith requirement. The plain language of the Act provides immunity for the disclosure of "any possible violation of law or regulation." The word "any" is broad and unambiguous. We conclude that the safe harbor provision of the Act is unambiguous, unqualified, and does not limit immunity to disclosures made in good faith. *See Coffman v. Cent. Bank & Trust Co.*, 2012 WL 4433293 (E.D. Ky. 2012).

Finally, the Venturas maintain that the BSA does not apply in this case because their claims are founded in state rather than federal law. Such argument, however, belies the plain language of the safe harbor provision which unequivocally states that a financial institution, and any director, officer, employee, or agent, that makes a disclosure of any possible violation of law or regulation to a government agency "shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement . . . ." 31 U.S.C. § 5318(g)(3)(A). Even the federal district court in ordering this matter remanded back to the state court observed, "[w]hile the BSA provides Central Bank with immunity from the Venturas' state law claims, it does not confer federal question jurisdiction upon this court because a case may not be removed to federal court on the basis of a federal defense, even if the defense is the only question truly at issue[.]"[3]

---

**3.** *Ventura*, 2015 WL 65139 (E.D. Ky. 2015)

(citing *Caterpillar, Inc. v. Williams*, 482 U.S.

As was the trial court, we are mindful and sympathetic to the Venturas. Clearly they feel victimized by Central Bank. However, we cannot escape the plain language of the BSA that provides broad immunity to banks for any and all disclosures made to a government agency or law enforcement official related to suspicious activities. We find nothing within the email exchange between Officer Cox and Campbell that falls outside the purview of the immunity provided by the BSA. As such, we must agree with the trial court that Central Bank was entitled to summary judgment.

For the reasons set forth herein, the order of the Powell Circuit Court is affirmed.

ALL CONCUR.

386, 399, 107 S.Ct. 2425, 96 L.Ed.2d 318    (1987)).