# United States Court of Appeals
## For the First Circuit

No. 15-1719

ALEXANDER YERSHOV,

Plaintiff, Appellant,

v.

GANNETT SATELLITE INFORMATION NETWORK, INC., d/b/a USA TODAY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter, Associate Justice,[*]
and Kayatta, Circuit Judge.

Ryan D. Andrews, with whom Roger Perlstadt and Edelson PC were on brief, for appellant.
Marc J. Zwillinger, with whom Jeffrey G. Landis, Jacob A. Sommer, ZwillGen PLLC, Heather B. Repicky, and Nutter McClennen & Fish LLP were on brief, for appellee.

April 29, 2016

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

KAYATTA, **Circuit Judge**.  Plaintiff Alexander Yershov brings this putative class-action lawsuit against Defendant Gannett Satellite Information Network, Inc. ("Gannett") for allegedly disclosing information about Yershov to a third party in violation of the Video Privacy Protection Act of 1988, Pub. L. No. 100-618, § 2, 102 Stat. 3195 (codified as amended at 18 U.S.C. § 2710) ("VPPA" or the "Act").  In ruling on a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), the district court found that the information Gannett disclosed concerning Yershov was "personally identifiable information" ("PII") under the VPPA, 18 U.S.C. § 2710(a)(3), but that Yershov was not a "renter, purchaser, or subscriber" of or to Gannett's video content and, therefore, not a "consumer" protected by the Act, id. § 2710(a)(1), (b)(1).  We agree with the district court that the information disseminated by Gannett concerning Yershov was PII, but we also find that the complaint adequately alleges that Yershov was a "consumer" under the VPPA. We therefore reverse the dismissal of the complaint and remand this case for further proceedings.

**I.**

We begin with the facts alleged in the complaint, simply assuming them to be true.  Davis v. Coakley, 802 F.3d 128, 130 (1st Cir. 2015).  Gannett is an international media company that produces news and entertainment programming, including the

- 2 -

newspaper USA Today. In addition to offering USA Today in printed form, Gannett digitally offers this content through a proprietary mobile software application called the "USA Today Mobile App" (the "App"). The App allows users to access news and entertainment media content, including videos, on their mobile devices.

To install the App on an Android device, users must visit the Google Play Store--an online digital media platform run by Google--and then download the App to their device. When opened for the first time, the App presents a screen that seeks the user's permission for it to "push" or display notifications on the device. After choosing "Yes" or "No," the user is directed to the App's main user interface. During this process, the App does not seek or obtain the user's consent to disclose anything about the user to third parties. Nevertheless, each time the user views a video clip on the App, Gannett sends to Adobe Systems Incorporated ("Adobe") (1) the title of the video viewed, (2) the GPS coordinates of the device at the time the video was viewed, and (3) certain identifiers associated with the user's device, such as its unique Android ID.[1]

---

[1] According to Yershov, "[t]he Android ID is a '64-bit number (as a hex string) that is randomly generated when the user first sets up the device and should remain constant for the lifetime of the user's device.'" Android IDs, Yershov alleges, are unique both to a specific device and user, such that where a device has multiple users, each user appears as a separate device.

Adobe is an unrelated third party that offers data analytics and online marketing services to its clients by collecting information about consumers and their online behavior. A unique identifier such as an Android ID allows Adobe "to identify and track specific users across multiple electronic devices, applications, and services" that a consumer may use. Adobe takes this and other information culled from a variety of sources to create user profiles comprised of a given user's personal information, online behavioral data, and device identifiers. The information contained in these profiles may include, for example, the user's name and address, age and income, "household structure," and online navigation and transaction history. These digital dossiers provide Adobe and its clients with "an intimate look at the different types of materials consumed by the individual" that "may reveal, or help create inferences about," a user's traits and preferences. They also allow Adobe's clients, such as Gannett, "to, among other things, accurately target advertisements to its users."

In late 2013, Yershov downloaded and installed the App on his Android mobile device. Yershov does not allege that he opted to receive push notifications, so we will assume that he did not. Yershov then used the App to read news articles and watch numerous video clips. At no time did he consent, agree, or otherwise permit Gannett to disclose any information about him to

third parties, nor did Gannett provide him with the opportunity to prevent such disclosures. Nevertheless, each time Yershov watched a video clip on the App, Gannett disclosed to Adobe the title of the viewed video, Yershov's unique Android ID, and the GPS coordinates of Yershov's device at the time the video was viewed. Using this information, Adobe was able to identify Yershov and link the videos he had viewed to his individualized profile maintained by Adobe.

## II.

We review de novo a district court's decision to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015). In conducting this review, "we accept as true all well-pled facts alleged in the complaint and draw all reasonable inferences in [the plaintiff's] favor." Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 36 (1st Cir. 2013). A plaintiff's allegations are sufficient to overcome a Rule 12(b)(6) motion if they contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 (2007).

Congress enacted the VPPA in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C., newspaper during his confirmation hearings. S. Rep. No. 100-599, at 5 (1988), reprinted in 1988 U.S.C.C.A.N.

4342-1.  The profile contained a list of 146 films that Judge Bork and his family had rented from a video store.  Id.  Members of Congress denounced the disclosure as repugnant to the right of privacy.  Id. at 5-8.  Congress then passed the VPPA "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials."  Id. at 1.

To effectuate this purpose, Congress in the VPPA created a civil remedy against a "video tape service provider" for "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).[2]  The statute defines the two terms at issue in this case as follows:

> (1) the term "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider;
>
> . . .
>
> (3) the term "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]

Id. § 2710(a)(1), (3).

---

[2] While Gannett claimed in its motion papers that it is not a "video tape service provider" under the VPPA, it did not challenge the sufficiency of Yershov's pleading as to this element of the claim.

**A.**

We agree with the district court that the information about Yershov that Gannett disclosed to Adobe fits the definition of PII. The statutory term "personally identifiable information" is awkward and unclear. The definition of that term ("identifies a person as having [obtained a video]") adds little clarity beyond training our focus on the question whether the information identifies the person who obtained the video. See id. § 2710(a)(3). Nevertheless, the language reasonably conveys the point that PII is not limited to information that explicitly names a person. Had Congress intended such a narrow and simple construction, it would have had no reason to fashion the more abstract formulation contained in the statute. See United States v. New Eng. Coal & Coke Co., 318 F.2d 138, 144 (1st Cir. 1963). Moreover, the language Congress did use to define PII begins with the word "includes." 18 U.S.C. § 2710(a)(3). That word normally implies that the proffered definition falls short of capturing the whole meaning. See In re Fahey, 779 F.3d 1, 5-6 (1st Cir. 2015) (explaining how its interpretation satisfied "the premise that when a statute states that the universe of X 'includes' Y, one normally presumes that Y is merely an example of what is in X, and that X includes more than Y"). Here, we also have the benefit of the official Senate Report expressly stating that the drafters' aim was "to establish a minimum, but not exclusive, definition of

- 7 -

personally identifiable information." S. Rep. No. 100-599, at 12. This makes sense. Many types of information other than a name can easily identify a person. Revealing a person's social security number to the government, for example, plainly identifies the person. Similarly, when a football referee announces a violation by "No. 12 on the offense," everyone with a game program knows the name of the player who was flagged.

Here, the complaint and its reasonable inferences describe what for very many people is a similar type of identification, effectively revealing the name of the video viewer. To use a specific example, imagine Gannett had disclosed that a person viewed 146 videos on a single device at 2 sets of specified GPS coordinates. Given how easy it is to locate a GPS coordinate on a street map,[3] this disclosure would enable most people to identify what are likely the home and work addresses of the viewer (e.g., Judge Bork's home and the federal courthouse). And, according to the complaint, when Gannett makes such a disclosure to Adobe, it knows that Adobe has the "game program," so to speak, allowing it to link the GPS address and device identifier information to a certain person by name, address, phone

---

[3] A U.S government website reports findings that, in 2011, the GPS accuracy on Android smart phones ranged from five to eight meters. How Accurate is the GPS on my Smart Phone? (Part 2), U.S. Nat'l Libr. Med. (July 7, 2014), http://communityhealthmaps.nlm.nih.gov/2014/07/07/how-accurate-is-the-gps-on-my-smart-phone-part-2/.

number, and more.  While there is certainly a point at which the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work, here the linkage, as plausibly alleged, is both firm and readily foreseeable to Gannett.  The complaint therefore adequately alleges that Gannett disclosed information reasonably and foreseeably likely to reveal which USA Today videos Yershov has obtained.

**B.**

We turn now to a closer question: Does the complaint adequately allege facts plausibly establishing that Yershov is a "consumer" in relation to Gannett within the meaning of the statute?  In arguing that his complaint adequately makes such an allegation, Yershov limits himself to arguing that he is a "subscriber" within the meaning of § 2710(a)(1), so we limit our own inquiry accordingly.  For the following reasons, we think that Yershov is a "subscriber."

We begin with the statutory text.  Because it contains no definition of the term "subscriber," nor any clear indication that Congress had a specific definition in mind, we assume that the "plain and ordinary meaning" of the word applies.  In re Hill, 562 F.3d 29, 32 (1st Cir. 2009).  To delineate the plain and ordinary meaning of the word "subscriber," we first look to its dictionary definition.  See In re JPMorgan Chase Bank, N.A., 799

- 9 -

F.3d 36, 43 (1st Cir. 2015).  All dictionaries appear to be clear that a "subscriber" is one who subscribes.  See, e.g., Merriam-Webster's Collegiate Dictionary 1244 (11th ed. 2012).  As for the meaning of the word "subscribe" itself, the dictionaries provide us with various choices.  As the first relevant definition of "subscribe," Merriam-Webster provides "to enter one's name for a publication or service."  Id.  More on point technologically, another dictionary defines "subscribe" as "[t]o receive or be allowed to access electronic texts or services by subscription" with "subscription" defined, in turn, to include "[a]n agreement to receive or be given access to electronic texts or services." The American Heritage Dictionary 1726 (4th ed. 2000).  This is just what we have here: Gannett offered and Yershov accepted Gannett's proprietary mobile device application as a tool for directly receiving access to Gannett's electronic text and videos without going through other distribution channels, much like how a newspaper subscriber in 1988 could, if he wished, retrieve a copy of the paper in a box at the end of his driveway without having to go look for it at a store.

We recognize that there are other common definitions of the term "subscribe" that include as an element a payment of some type and/or presume more than a one-shot transaction.  See The Random House Dictionary of the English Language 1896 (2nd ed. 1987) (defining the term "subscriber" as "a person . . . that

- 10 -

subscribes . . . to a publication," the term "subscribes" as "to obtain a subscription," and the term "subscription" as "the right to receive a periodical for a sum paid, usually for an agreed number of issues"). Yershov's decision to download the App seems a fair enough indication that he intended more than a one-shot visit. He makes no claim, though, that he was required to pay any money. So the question is posed: Should we read the statutory term "subscriber" as incorporating monetary payment as a necessary element, or rather as encompassing the broader common definition of the term?

Looking at the statute, we first note that if the term "subscriber" required some sort of monetary payment, it would be rendered superfluous by the two terms preceding it. Presumably a person in 1988 who exchanged payment for a copy of a video either retained ownership of the video outright, thereby becoming a "purchaser" of the video, or received temporary possession of the video for a set period of time, thereby becoming a "renter." Congress would have had no need to include a third category of persons protected under the Act if it had intended that only persons who pay money for videos be protected, which militates against an interpretation of the statute incorporating such an element. See Nat'l Org. Marriage v. McKee, 649 F.3d 34, 66 (1st Cir. 2011) ("[A] statute should "'be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous,

void, or insignificant.'" (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001))).

Consider, too, the reasonably common retailing practice of introductory enticements. Suppose a customer in 1988 obtained several videos from a new commercial supplier at no charge, or with money back. We can discern no reason why Congress would have wanted different disclosure rules to apply to those transactions than to ones where a monetary payment is made. And because we think that Congress cast such a broadly inclusive net in the brick-and-mortar world, we see no reason to construe its words as casting a less inclusive net in the electronic world when the language does not compel that we do so. See Barr v. United States, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.").

Our unwillingness to adopt one of the narrower meanings of "subscriber" rests as well on our recognition that Congress itself, in 2012, considered the impact of the VPPA on the electronic distribution of videos and chose only to make consent easier to obtain, rather than limiting the reach of the Act in the absence of consent. See 158 Cong. Rec. H6849-01 (Dec. 18, 2012). Congress left untouched the definition of "consumer" in the statute, which we believe supports an inference that Congress

understood its originally-provided definition to provide at least as much protection in the digital age as it provided in 1988. For the aforementioned reasons, we therefore decline to interpret the statute as incorporating monetary payment as a necessary element.

We have also considered the opinion of the Eleventh Circuit in Ellis v. Cartoon Network, Inc., 803 F.3d 1251 (11th Cir. 2015). While the court in Ellis agreed that one can be a "subscriber" without making a monetary payment, it nonetheless found that the plaintiff's acts of downloading and using a free mobile device application from the Cartoon Network did not make him a "subscriber" under the VPPA. Id. at 1256-58. Expressly tracking the reasoning of the Massachusetts district court in this case, Ellis construed the term "subscriber" to "involve[] some type of commitment, relationship, or association (financial or otherwise) between a person and an entity," id. at 1256, and thus expressed its agreement with the district court in this case that subscriptions "involve some or [most] of the following [factors]: payment, registration, commitment, delivery, [expressed association,] and/or access to restricted content," id. (alterations in original) (quoting Yershov v. Gannett Satellite Info. Network, Inc., 104 F. Supp. 3d 135, 147 (D. Mass. 2015)). It then found that there existed too few factors in the particular case before it, explaining that the plaintiff did not "sign up for or establish an account," "make any payments," "become a registered

- 13 -

user," "receive a Cartoon Network ID," "establish a Cartoon Network profile," "sign up for any periodic services or transmissions," or "make any commitment or establish any relationship that would allow him to have access to exclusive or restricted content." Id. at 1257. The Ellis court was also under the impression that the user of the application in that case did not have "to provide any information to Cartoon Network." Id. at 1254.

We would describe the allegations (and their reasonable inferences) in this case quite differently. To use the App, Yershov did indeed have to provide Gannett with personal information, such as his Android ID and his mobile device's GPS location at the time he viewed a video, each linked to his viewing selections. While he paid no money, access was not free of a commitment to provide consideration in the form of that information, which was of value to Gannett. And by installing the App on his phone, thereby establishing seamless access to an electronic version of USA Today, Yershov established a relationship with Gannett that is materially different from what would have been the case had USA Today simply remained one of millions of sites on the web that Yershov might have accessed through a web browser.

Ellis, like the district court, also presumed that downloading a mobile device application "is the equivalent of adding a particular web site to one's Internet browser as a

- 14 -

favorite."  Id. at 1257.  We do not think that such a presumption is so apparently true as to dictate our reading of the complaint, which concedes no such equivalence.  Why, after all, did Gannett develop and seek to induce downloading of the App?  And it is by no means self-evident that the version of USA Today one accesses with a browser is identical in all respects to the electronic version one accesses with the App.

Our conclusion is further informed by positing a non-electronic version of the electronic relationship between Yershov and Gannett.  Imagine that Gannett had installed a hotline at Yershov's home, for free, allowing him to call Gannett and receive instant delivery of videos in exchange for his name and address, and he then used the hotline over the course of many months to order videos.  We doubt that Congress would have intended that Gannett would have been free in such a scenario to publish Yershov's PII by claiming that he was not a purchaser, renter, or subscriber.  This physical world hypothetical is admittedly unrealistic, but only because installing a hotline is expensive in comparison to the value of obtaining Yershov's name and address.  Here, by contrast, the marginal cost to Gannett of maintaining the App for Yershov and electronically allowing him to access its video content through it may well be less than the value to Gannett of having Yershov use the App and provide his PII.  We see nothing in

these differences, though, to find Yershov to be a subscriber in one scenario and not the other.

Our actual holding, in the end, need not be quite as broad as our reasoning suggests. We need simply hold, and do hold, only that the transaction described in the complaint--whereby Yershov used the mobile device application that Gannett provided to him, which gave Gannett the GPS location of Yershov's mobile device at the time he viewed a video, his device identifier, and the titles of the videos he viewed in return for access to Gannett's video content--plausibly pleads a case that the VPPA's prohibition on disclosure applies. As is often true with Rule 12(b)(6) motions, further development of the facts may cast that which is alleged in a different light. For example, does Gannett itself classify those who access its content through the App differently from those who access its website only? Are the content and format the same through either channel? Does access through the App generate value for Gannett that website access does not? Is Yershov correct about the extent to which Adobe foreseeably can identify him? Answers to these and similar questions may enable a more refined, and possibly different, conclusion on the ultimate question of whether Gannett has violated the VPPA. For now, though, the facts that Yershov alleges, together with reasonable inferences drawn from those facts,

- 16 -

plausibly describe a relationship between Yershov and Gannett, combined with a disclosure by Gannett, that ran afoul of the VPPA.

**III.**

The district court's decision is <u>reversed</u> and this case is <u>remanded</u> for further proceedings consistent with this opinion.